Slip Op. 23-72

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| SHANTOU RED GARDEN FOOD PROCESSING CO., LTD., SHANTOU RED GARDEN FOODSTUFF CO., LTD., and OCEAN BISTRO CORPORATION, | : : : : : | |
| Plaintiffs, | : : | |
| v. | : : | Before: Richard K. Eaton, Judge |
| UNITED STATES, | : : | Court No. 20-03947 |
| Defendant, | : : | **PUBLIC VERSION** |
| and | : : | |
| AD HOC SHRIMP TRADE ACTION COMMITTEE, | : : : | |
| Defendant-Intervenor. | : : | |

## <u>OPINION</u>

[U.S. Department of Commerce's final results of fourteenth administrative review of the antidumping duty order on frozen warmwater shrimp from the People's Republic of China are sustained.]

Dated: May 12, 2023

*John J. Kenkel*, deKieffer & Horgan, PLLC, of Washington, D.C., argued for Plaintiffs Shantou Red Garden Food Processing Co., Ltd., Shantou Red Garden Foodstuff Co., Ltd., and Ocean Bistro Corporation. With him on the brief were *Alexandra H. Salzman* and *J. Kevin Horgan*.

*Kara M. Westercamp*, Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant the United States. With her on the brief were *Brian M. Boynton*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director. Of counsel on the brief was *Jesus N. Saenz*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

*Sophia J.C. Lin* and *Nathaniel Maandig Rickard*, Picard, Kentz & Rowe LLP, of Washington, D.C., argued for Defendant-Intervenor Ad Hoc Shrimp Trade Action Committee.

Eaton, Judge: This case involves the final results of the U.S. Department of Commerce's ("Commerce" or the "Department") fourteenth administrative review of the antidumping duty order on certain frozen warmwater shrimp from the People's Republic of China ("Order"). *See Certain Frozen Warmwater Shrimp from the People's Republic of China*, 85 Fed. Reg. 83,891 (Dep't Commerce Dec. 23, 2020) ("Final Results") and accompanying Issues and Decision Mem. (Dec. 17, 2020) ("Final IDM"), PR 185; *see also Certain Frozen Warmwater Shrimp From the People's Republic of China*, 70 Fed. Reg. 5,149 (Dep't Commerce Feb. 1, 2005) (Order).

Plaintiffs in this action are (1) Shantou Red Garden Food Processing Co., Ltd. ("Shantou Processing"), an exporter and producer of the subject shrimp and the mandatory respondent in the review; (2) Shantou Red Garden Foodstuff Co., Ltd. ("Shantou Foodstuff"), its affiliated exporter; and (3) Ocean Bistro Corporation, a U.S. importer (collectively, "Plaintiffs"). By their motion for judgment on the agency record, Plaintiffs challenge the Final Results. *See* Pls.' Mem. Supp. Mot. J. Agency R. ("Pls.' Br."), ECF No. 24-1; Pls.' Reply, ECF No. 35.

Defendant the United States ("Defendant"), on behalf of Commerce, and Defendant-Intervenor the Ad Hoc Shrimp Trade Action Committee, a coalition of U.S. shrimp producers (the "Ad Hoc Committee"),[1] oppose the motion and ask the court to sustain the Final Results. *See* Def.'s Resp. Opp'n Pls.' Mot. J. Agency R., ECF No. 31; Ad Hoc Committee's Resp. Opp'n Pls.' Mot. J. Agency R., ECF No. 29.

---

[1]     The Ad Hoc Committee was the petitioner in the original investigation and requested the underlying administrative review. *See* Ad Hoc Committee's Request for Admin. Revs. (Feb. 25, 2019), PR 1.

The court has jurisdiction under 28 U.S.C. § 1581(c) (2018) and 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018). Commerce's Final Results will be sustained unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

For the following reasons, Plaintiffs' motion is denied, and the Final Results are sustained.

## BACKGROUND

### I.    Initiation of the Fourteenth Administrative Review of the Order

In May 2019, Commerce initiated the underlying administrative review. *See Initiation of Antidumping and Countervailing Duty Admin. Revs.*, 84 Fed. Reg. 18,777 (Dep't Commerce May 2, 2019). The period of review was February 1, 2018, through January 31, 2019. *Id.* at 18,787.

Commerce selected Shantou Processing to be the sole mandatory respondent in the review.[2] *See Certain Frozen Warmwater Shrimp From the People's Republic of China*, 85 Fed. Reg. 12,894, 12,894-95 (Dep't Commerce Mar. 5, 2020) ("Preliminary Results") and accompanying

---

[2]    This Court and the Federal Circuit have noted that Commerce's practice of selecting only one mandatory respondent raises a question as to the representativeness of the rate. *See, e.g.*, *Fusong Jinlong Wooden Grp. Co. v. United States*, 46 CIT __, __, 617 F. Supp. 3d 1221, 1227 n.10 (2022); *Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 45 CIT __, __, 519 F. Supp. 3d 1224, 1236 (2021) (footnote omitted) (first citing *Zhejiang Native Produce & Animal By-Prods. Imp. & Exp. Corp. v. United States*, 33 CIT 1125, 637 F. Supp. 2d 1260 (2009); and then citing *Carpenter Tech. Corp. v. United States*, 33 CIT 1721, 662 F. Supp. 2d 1337 (2009)) ("Commerce's practice has devolved to the point where it regularly chooses only two (and sometimes one) mandatory respondents to be 'representative' of unexamined respondents for the purpose of calculating the [separate] rate in a review, a [practice] that this Court has regarded with some skepticism."); *Xiping Opeck Food Co. v. United States*, 45 CIT __, __, 551 F. Supp. 3d 1339, 1356-57 (2021) ("There can be little question that, if Commerce were to change its method and name more than two mandatory respondents, separate rate companies would receive more accurate rates, and a great deal of litigation would be avoided."); *see also YC Rubber Co. (N. Am.) LLC v. United States*, No. 21-1489, 2022 WL 3711377, at *3-4 (Fed. Cir. Aug. 29, 2022) (not reported in Federal Reporter) (holding that "Commerce unlawfully restricted its examination to a single respondent" under 19 U.S.C. § 1677f-1(c)(2)).

Preliminary Decision Mem. (Feb. 28, 2020) ("PDM") at 1, PR 134. Shantou Foodstuff, as Shantou Processing's affiliate, participated in the proceeding by answering Commerce's questionnaires, although Shantou Foodstuff had no sales of its own during the period of review. *See* PDM at 2-3.

Shantou Processing, on the other hand, both produced and exported subject merchandise to the United States during the period of review. It claimed, however, that its sales were not subject to review because it had no "sales of subject merchandise *subject to the antidumping duty order in the instant administrative review.*" Certification of No Sales (May 17, 2019), PR 16 (emphasis added); *see* Commerce's Revised No Shipment Mem. (July 23, 2019), CR 1 (stating that Shantou Processing manufactured, exported, and shipped thirteen entries of subject merchandise to importer Ocean Bistro Corporation during the period of review). Shantou Processing based its claim on a 2013 Federal Register notice, in which Commerce partially revoked the Order with respect to merchandise produced and exported by a company called "Red Garden Food Processing Co., Ltd."[3] *See Certain Frozen Warmwater Shrimp From the People's Republic of China*, 78 Fed. Reg. 18,958, 18,959 n.14 (Dep't Commerce Mar. 28, 2013) ("Revocation Notice"); Pls.' Cmts. on New Factual Information Regarding Shipments by Red Garden Food Processing Co., Ltd. (July 29, 2019) at 2, PR 29 (citing Revocation Notice).

---

[3]     The court notes that "Red Garden Food Processing Co., Ltd." (without Shantou preceding it) is the name Commerce used to refer to Shantou Foodstuff's "sister company" in the 2004 final decision memorandum of the original less-than-fair-value investigation that led to the Order. *See* Pls.' Cmts. on New Factual Information Regarding Shipments by Red Garden Food Processing Co., Ltd. (July 29, 2019) Ex. 5 (Final Issues and Decision Mem. for the Antidumping Duty Investigation of Certain Frozen and Canned Warmwater Shrimp From the People's Republic of China at cmts. 3, 6(C) (Dep't Commerce Nov. 29, 2004) ("Investigation IDM")), PR 29.

Commerce's partial revocation of the Order resulted from a separate proceeding conducted

under Section 129 of the Uruguay Round Agreement Act ("URAA").[4] The Revocation Notice

excluded from the Order an exporter-producer combination[5] that involved Red Garden Food

---

[4]       Section 129 of the URAA "governs the nature and effect of determinations issued by the Department to implement findings by [the World Trade Organization or "WTO"] dispute settlement panels and the Appellate Body." Revocation Notice, 78 Fed. Reg. at 18,958. At the time of the shrimp investigation in 2004, Commerce had a practice of using *zeroing* when calculating dumping margins in investigations. Zeroing is "where negative dumping margins (i.e., margins of sales of merchandise sold at nondumped prices) are given a value of zero and only positive dumping margins (i.e., margins for sales of merchandise sold at dumped prices) are aggregated." *Union Steel v. United States*, 713 F.3d 1101, 1104 (Fed. Cir. 2013). Commerce used zeroing to determine the margins in the shrimp investigation in its 2004 final determination. *See* Investigation IDM cmt. 5.

In 2005, as a result of a challenge to zeroing brought by the European Communities, the WTO found that zeroing was inconsistent with U.S. international obligations. In 2006, Commerce ceased using zeroing in investigations. *See Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin During an Antidumping Investigation; Final Modification*, 71 Fed. Reg. 77,722, 77,722 (Dep't Commerce Dec. 27, 2006) ("Final Modification for Investigations") ("[T]he Department will no longer make average-to-average comparisons in investigations without providing offsets for non-dumped comparisons.").

In 2011, China successfully challenged Commerce's use of zeroing in the 2004 shrimp investigation before the WTO. In 2012, Commerce initiated a Section 129 proceeding, which resulted in Commerce recalculating Shantou Foodstuff's and Red Garden Food Processing Co., Ltd.'s antidumping rate without the use of zeroing. *See* Revocation Notice, 78 Fed. Reg. at 18,958 ("[T]he Department recalculated the weighted-average dumping margins from the antidumping investigation of shrimp from [China] by applying the calculation methodology described in [Final Modification for Investigations]." (citation omitted)). This resulted in the partial revocation of the Order with respect to an exporter-producer combination involving Red Garden Food Processing Co., Ltd. *Id.* at 18,959 n.14.

[5]       Commerce's regulations provide that where "subject merchandise . . . is exported to the United States by a company that is *not* the producer of the merchandise, the Secretary may establish a 'combination' cash deposit rate *for each combination* of the exporter and its supplying producer(s)." 19 C.F.R. § 351.107(b)(1)(i) (2020) (emphasis added). Additionally, Commerce has published a policy bulletin that describes the use of combination rates in nonmarket economy country cases, such as those involving merchandise from China. *See* Imp. Admin., U.S. Dep't of Com., *Separate-Rates Practice & Application of Combination Rates in Antidumping Investigations Involving Non-Market Economy Countries*, Policy Bulletin 05.1 at 6-7 (Apr. 5, 2005), https://enforcement.trade.gov/policy/bull05-1.pdf (last visited Apr. 20, 2023). Under this

Processing Co., Ltd. As a result of the partial revocation in 2013, merchandise that was *produced* by Red Garden Food Processing Co., Ltd. (or five other Chinese producers that have since gone out of business[6]) and *exported* by Red Garden Food Processing Co., Ltd. (or Shantou Foodstuff) was excluded from the Order.[7] *See* Revocation Notice, 78 Fed. Reg. at 18,959 n.14.

In August 2019, Commerce asked Shantou Processing to clarify what relationship, if any, it had with Red Garden Food Processing Co., Ltd., the producer and exporter named in the Revocation Notice. *See* Commerce's Request for Clarification of Company's Name (Aug. 8, 2019), PR 30.

---

policy, Commerce "assigns separate rates only to exporters that have demonstrated their independence from *de jure* and *de facto* government control over their export activities," and the exporter's separate rate "will be specific to those *producers that supplied the exporter* during the period of investigation." *Id.* at 6 (emphasis added). The policy only speaks of investigations, but it has been applied in administrative reviews. *See, e.g.*, *Lifestyle Enter., Inc. v. United States*, 35 CIT 158, 186 n.40, 186, 768 F. Supp. 2d 1286, 1313 n.40, 1314 (2011) ("Commerce has a duty to prevent circumvention of [antidumping duty] law and may do so by imposing combination rates." (citations omitted)).

[6]     The five Chinese producers were: Chaoyang Jindu Hengchang Aquatic Products Enterprise Co., Ltd., Raoping County Longfa Seafoods Co., Ltd., Meizhou Aquatic Products Quick-Frozen Industry Co., Ltd., Shantou Jinyuan District Mingfeng Quick-Frozen Factory, and Shantou Long Feng Foodstuffs Co., Ltd. *See* Revocation Notice, 78 Fed. Reg. at 18,959 n.14.

[7]     The court notes that, though Commerce's regulations contemplate that combination rates apply when "subject merchandise . . . is exported to the United States by a company *that is not the producer of the merchandise*," here, Commerce apparently found that Red Garden Food Processing Co., Ltd. could itself form a "combination" when it was both the producer and exporter of subject merchandise. *See* 19 C.F.R. § 351.107(b)(1)(i); *supra* note 5; *see also* Preliminary Successor-In-Interest Determination (Feb. 28, 2020) at 12, PR 136 (noting that Commerce found that Red Garden Food Processing Co., Ltd. "should be revoked from the order (when it exported goods produced by itself or other specific producers)"). Whether Shantou Processing could be a combination with itself is not in dispute here, but it strikes the court that the regulation, by its plain terms, would not recognize a claim that a single company could by itself form a combination and receive a combination rate. Since the only U.S. sales at issue in this case were of merchandise produced and exported by Shantou Processing, it is difficult to see how Shantou Processing could claim that any of its sales were excluded because they were made by an excluded combination.

The company responded that Red Garden Food Processing Co., Ltd. was the same entity as *Shantou* Red Garden Food Processing Co., Ltd. (i.e., Shantou Processing). *See* Pls.' Resp. to Commerce's Request for Clarification of Company's Name (Aug. 13, 2019), PR 31. For Shantou Processing, the omission of "Shantou" from the name "Red Garden Food Processing Co., Ltd." in the Revocation Notice was merely a clerical error. *Id.* at 2.

In September 2019, Defendant-Intervenor the Ad Hoc Committee disputed the claim that Red Garden Food Processing Co., Ltd. and Shantou Red Garden Food Processing Co., Ltd. (i.e., Shantou Processing) were the same company. The committee alleged that after the Order was issued in 2005 Red Garden Food Processing Co., Ltd. changed its name twice—in 2007 and again in January 2013 prior to the partial revocation of the Order just a few months later, in March 2013. *See* PDM at 3.

In October 2019, Commerce issued its antidumping questionnaire to Shantou Processing and invited comment on the information contained in the Ad Hoc Committee's filing regarding the alleged name changes.

Shantou Processing responded to Commerce's questionnaire and the Ad Hoc Committee's allegations, insisting that Shantou Processing was the same company as the excluded Red Garden Food Processing Co., Ltd. *See* Resp. to Domestic Producers' Letter of Sept. 6, 2019 (Oct. 21, 2019), PR 66 (Part I) & 67 (Part II). Shantou Processing stated that it was established as "Shantou Red Garden Food Processing Co., Ltd." in 2003 as a joint venture between a U.S. company called Red Chamber Co. and Plaintiff Shantou Foodstuff. *See id.*, Part I at 3. Shantou Processing acknowledged, however, that it changed its name twice—first to Shantou Jin Cheng Food Co., Ltd. ("Shantou JCF") in 2007, and then back to Shantou Red Garden Food Processing Co., Ltd. (i.e., Shantou Processing) in 2013. *See id.*, Part I at 9-11. Shantou Processing maintained that

despite the name changes, "for all intents and purposes, [Shantou Processing] today is the same company that it was prior to and during the period of investigation." *Id.* at 8. As shall be seen, there are various explanations for the name changes.

Thereafter, the American Shrimp Processors Association[8] asked that Commerce conduct a successor-in-interest analysis, arguing that "the current incarnation of [Shantou Processing] is not eligible to receive the treatment granted the original [Shantou Processing] until Commerce makes a successor-in-interest determination . . . ." Am. Shrimp Processors Ass'n's Resp. (Oct. 24, 2019) at 6, PR 68; *see also* PDM at 7-8.

In this opinion, to distinguish among the different "incarnations" of the entity that became Shantou Processing from its establishment in 2003 to the period of review, the court will use (1) "Red Garden Food Processing Co., Ltd." to refer to the entity as it existed from 2003 to 2007, i.e., the period prior to its first name change in 2007; (2) Shantou Jin Cheng Food Co., Ltd. or "Shantou JCF" will refer to the entity as it existed from 2007 to 2013; and (3) "Shantou Red Garden Food Processing Co., Ltd." or "Shantou Processing" will refer to the entity from 2013 through the period of review.

## II.    Commerce's Successorship Inquiry

Following the American Shrimp Processors Association's request that Commerce conduct a successor-in-interest analysis, the Department issued supplemental questionnaires to Shantou Processing, asking for additional information regarding its ownership, management, corporate

---

[8]    The American Shrimp Processors Association is a trade association whose members produce the domestic like product in the United States. *See* Am. Shrimp Processors Ass'n's Request for Rev. (Feb. 27, 2019) at 1, PR 2. It participated in the underlying administrative review but is not a party in this action.

structure, affiliations, and business operations. *See* PDM 3-4. Shantou Processing timely filed responses to the supplemental questionnaires. *Id.*

At the close of the questionnaire phase, Commerce analyzed whether Shantou Processing was the successor-in-interest to Red Garden Food Processing Co., Ltd. If it was the successor, Shantou Processing would be "entitled to rely on Commerce's revocation finding made with respect to exporter/producer combination[] involving [Red Garden Food Processing Co., Ltd.]." Preliminary Successor-In-Interest Determination (Feb. 28, 2020) ("Successorship Memo") at 5, PR 136, CR 83.

In the Successorship Memo, Commerce stated that it "generally consider[s] a company to be the successor to another company for [antidumping duty] cash deposit purposes if the *operations of the successor are not materially dissimilar* from those of its predecessor." *Id.* (emphasis added). When making a successorship finding, Commerce applies a "totality of the circumstances" test, which takes into account a non-exhaustive list of factors, that includes changes in management, production facilities, supplier relationships, and customer base. *Id.* at 5-6.

Ultimately, Commerce found that Shantou Processing was *not* a successor-in-interest to Red Garden Food Processing Co., Ltd. Thus, the Department found that Shantou Processing was *not* entitled to rely on Commerce's revocation of the Order with respect to the excluded exporter-producer combination. *See id.* at 13. In other words, Commerce found that Shantou Processing's U.S. sales of subject shrimp were subject to the Order.

### III.    Commerce's Preliminary and Final Results

Thereafter, in the Preliminary Results, Commerce found that Shantou Processing dumped subject merchandise in the United States during the period of review and determined an antidumping duty rate of 58.61% for the company. *See* Preliminary Results, 85 Fed. Reg. at 12,895.

In the Final Results, Commerce deactivated the exporter-producer combination that involved Red Garden Food Processing Co., Ltd. as producer and exporter, the five Chinese producers other than Red Garden Food Processing Co., Ltd., and Shantou Foodstuff, as exporter. Final IDM at 28 (concluding that it would inform U.S. Customs and Border Protection ("Customs") "that the exclusion for this exporter-producer combination is no longer active"). Specifically, Commerce found that the combination no longer existed because Shantou Processing was not the successor-in-interest to Red Garden Food Processing Co., Ltd., and none of the other Chinese producers listed as part of the excluded combination were still in business. Commerce stated that when it issued the cash deposit instructions for the administrative review to Customs, it would "set up a new company case number for" Shantou Processing and Shantou Foodstuff and would require the companies "to provide cash deposits at the rate established in these final results." Final IDM at 26.

Commerce also collapsed Shantou Processing and Shantou Foodstuff, which are affiliates, into a single entity. The Department continued to find that the collapsed entity dumped subject merchandise during the period of review and determined a final weighted average dumping margin of 58.96% for the collapsed entity. *See* Final Results, 85 Fed. Reg. at 83,892.

Finally, when calculating Shantou Processing's rate, Commerce deducted trucking expenses as an adjustment to U.S. price for certain sales, i.e., those sales where trucking services from the port to the U.S. customer's warehouse had been contracted for, but were not provided.

Commerce reduced the U.S. price based on the record evidence showing that Shantou Processing

deducted trucking expenses from the price charged to its customer.


## DISCUSSION

I.  **Commerce's Successorship Finding Is Supported by Substantial Evidence and Otherwise in Accordance with Law**

The court first turns to Plaintiffs' claim that Shantou Processing is the same company as

Red Garden Food Processing Co., Ltd., the company that was excluded from the Order.

In the Final Results, Commerce found that Shantou Processing was not excluded from the

Order because it was not the successor-in-interest to Red Garden Food Processing Co., Ltd. *See*

Successorship Memo at 12. When making this finding, Commerce applied a "totality of the

circumstances" test:

> In evaluating successorship issues, we generally consider a company to be the successor to another company for [antidumping] cash deposit purposes if the operations of the successor are not materially dissimilar from those of its predecessor. In making this determination for purposes of applying the [antidumping] law, Commerce examines a number of factors including, but not limited to, changes in: (1) management, (2) production facilities, (3) supplier relationships, and (4) customer base. Although no single, or even several, of these factors will necessarily provide a dispositive indication of succession, generally, Commerce will consider a company to be a successor if its resulting operation is not materially dissimilar to that of its predecessor. Thus, if the "totality of circumstances" demonstrates that, with respect to the production and sale of the subject merchandise, the new company operates as the same business entity as the prior company, Commerce will assign the new company the cash deposit rate of its predecessor.

*Id.* at 5-6 (citations omitted). This test or method is the same one that Commerce uses when it

conducts changed circumstances reviews. *See Marine Harvest (Chile) S.A. v. United States*, 26

CIT 1295, 1299, 244 F. Supp. 2d 1364, 1369 (2002) (noting that Commerce determined

successorship in a changed circumstances review by "considering such factors as the companies'
management, production facilities, supplier relationships, and customer base").

Commerce thus considered the record evidence for each factor that provided a comparison
of the business operations of Red Garden Food Processing Co., Ltd. and Shantou Processing.

### A.  Management

In conducting its successor-in-interest analysis, Commerce first looked at the management,
ownership, and control of Red Garden Food Processing Co., Ltd. and Shantou Processing.

Red Garden Food Processing Co., Ltd. was established in 2003 as a joint venture between
Plaintiff Shantou Foodstuff and a U.S. company called Red Chamber Co..[9] *See* Successorship
Memo at 6. For its part, Shantou Foodstuff was owned by two individuals, i.e., Zheng Chu Ci and
Lin Zhi Quan.[10] *Id.*

In 2003, management of Red Garden Food Processing Co., Ltd. consisted of a board of
directors,[11] a general manager, and a vice general manager:

> During the [less than fair value] investigation, [Red Garden Food Processing Co.,
> Ltd.]'s board of directors had three members, two of whom (*i.e.*, Min Bing Kou and
> Min Shin Kou) were appointed by the foreign owner [i.e., the U.S. owner. Red
> Chamber] and one by [Shantou Foodstuff]. Min Bing Kou also served as the legal
> representative and the Board Chairman, and he was solely responsible for
> authorizing the withdrawal of funds from the bank accounts owned by [Red Garden
> Food Processing Co., Ltd.].

---

[9]      *See* Successorship Memo at 6 ("Red Chamber Co.  .  .  .  owned 51 percent
through its affiliate Aqua Star Imports, Inc. . . . . [Shantou Foodstuff] owned the remaining 49
percent.").

[10]     Zheng Chu Ci and Lin Zhi Quan owned 71.67 percent and 28.33 percent
of Shantou Foodstuff, respectively. Successorship Memo at 6.

[11]     As to the board's authority, "[Red Garden Food Processing Co., Ltd.]'s constitution
states that  "the board {of directors} is the most powerful organization . . . and decide (*sic*) on all
the important business of the Company". Successorship Memo at 6.

> [Red Garden Food Processing Co., Ltd.] also had a general manager and a vice general manager. The general manager was Zheng Chu Ci; . . . this individual was a part owner of [Shantou Foodstuff] and, thus, was an indirect shareholder of [Red Garden Food Processing Co., Ltd.]. The general manager executed the decisions of the board and asked the board to make important decisions, including those involving company name changes . . . .

*Id.* at 6-7.

In 2007, Red Garden Food Processing Co., Ltd. changed its name to Shantou JCF. *Id.* at 7.

Then, in January 2013, three months prior to the publication of the Revocation Notice, Shantou

JCF changed its name to "Shantou Red Garden Food Processing Co., Ltd." (i.e., Shantou

Processing). *Id.* There is no dispute that the name changes took place.

In addition to the name change that occurred in 2013, the company's structure, ownership,

and control changed. The U.S. owner, Red Chamber Co., "withdrew from the [joint venture] and

was no longer a shareholder after July of [2013]." *Id.* Thereafter, the company was reorganized as

a limited liability company and was majority owned by two individuals.[12] *Id.* Also, the board of

directors was dissolved.

Instead of a board of directors, decision-making authority for Shantou Red Garden Food

Processing Co., Ltd. (i.e., Shantou Processing) rested exclusively in one of the two individual

owners:

> [Shantou Processing] has no board of directors. [Shantou Processing] claimed that because it is "a small privately-owned corporation . . . the company believes that there is no need for an *independent board of directors*. For the same reason, [an individual owner,   Zheng Chu Ci   ,] controls all decisions made by the company." [Shantou Processing] confirmed that it "did not establish a board of directors after the change of ownership." [An individual owner,   Zheng Chu Ci,] also now serves as the legal representative and has control of the bank accounts owned by [Shantou Processing].

---

[12]     The two individual owners were Zheng Chu Ci, who owned 41 percent, and his wife Shen Rui Jie, who owned 10 percent, for a total of 51 percent majority ownership. Successorship Memo at 7. Shantou Foodstuff owned the remaining 49 percent. *Id.*

*Id.* at 7-8 (emphasis added). In the Successorship Memo, Commerce found that "there was significant change in ownership, control, and management between [Red Garden Food Processing Co., Ltd.] (as it existed at the time of the [less-than-fair-value] investigation) and [Shantou Processing] (now)."[13] *Id.* at 8. Commerce further found that "[t]hese changes weigh in favor of finding that [Shantou Processing] (now) is *materially dissimilar* to [Red Garden Food Processing Co., Ltd.] (2003), and thus, is not the successor-in-interest to that company." *Id.* (emphasis added). In other words, Commerce found that the management of the company materially changed between 2003 and the underlying 2018-2019 review because of (1) the withdrawal of the U.S. joint venture partner, Red Chamber Co., in 2013; (2) the change in structure from a joint venture to a limited liability company in 2013; (3) the change in majority ownership, i.e., from the U.S. joint venture partner owning a majority of shares to two individuals, Zheng Chu Ci, who owned 41%, and his wife Shen Rui Jie, who owned 10%, owning a majority of shares; and (4) the change in decision-making authority through the dissolution of the independent board of directors and placement of exclusive control of all decisions, legal representation, and bank accounts in one of the owners.[14]

### B. Production Facilities

Next, Commerce found that while Red Garden Food Processing Co., Ltd. (2003 - 2007), Shantou JCF (2007 - 2013), and Shantou Processing (2013 - the period of review) used the same production *facility*, the *products* produced in that facility changed. Successorship Memo at 8.

---

[13]     Commerce found: "[Red Garden Food Processing Co., Ltd.] was a Sino-foreign [joint venture] where the foreign party was the majority owner and controlled the board of directors (which in turn controlled the company). [Shantou Processing] is fully owned by Chinese entities/individuals and Zheng Chu Ci maintains complete control over the company." Successorship Memo at 8.

[14]     The owner referred to was Zheng Chu Ci.

Specifically, Commerce found that the original Red Garden Food Processing Co., Ltd. processed and sold subject shrimp to the United States. But during the years 2007 to 2013, i.e., after the name change to Shantou JCF, Shantou JCF did *not* ship subject merchandise to the United States. "Instead, Shantou JCF shipped only non-subject merchandise to the United States (*i.e.*, shrimp that was excluded from the order: breaded shrimp and, before 2011 when it was added to the order, dusted shrimp)." *Id.*

Then, after the second name change in 2013 to Shantou Red Garden Food Processing Co., Ltd. (i.e., Shantou Processing), the company "processed and sold subject merchandise to the United States." *Id.* Commerce thus found that "the products and production facility, when viewed together with the totality of the circumstances over this time period and other information on the record, indicate and weighs [sic] in favor of finding that [Shantou Processing] is not the successor-in-interest to [Red Garden Food Processing Co., Ltd.]." *Id.*

### C. Suppliers

Commerce found that the suppliers factor, too, favored a negative successorship determination:

> [Shantou Processing] stated that its suppliers changed many times over the past 15 years. Although we requested more specific information regarding its suppliers, [Shantou Processing] claimed that it does not keep records for its suppliers prior to the [period of review] because it has no business reason to maintain this information.

> Thus, based on the limited information on the record and based on [Shantou Processing]'s characterization that its suppliers have changed many times in the past 15 years, we find no evidence on the record with respect to this factor which supports [Shantou Processing]'s claim that it continues to operate as [Red Garden Food Processing Co., Ltd.], the company revoked from the *Order*.

Successorship Memo at 9-10.

### D. Customer Base

Next, Commerce found very little overlap in Red Garden Food Processing Co., Ltd.'s and Shantou Processing's customers. *See* Successorship Memo at 9-10.[15] What is more, Commerce observed that Shantou Processing "has significantly increased its customer base, such that it now sells to a number of new companies, which is a marked contrast to the situation during the period examined in the [less-than-fair-value] investigation." *Id.* at 10. Commerce thus found that the

---

[15]        Commerce stated:

[Red Garden Food Processing Co., Ltd.] sold to two customers located in the United States, both of whom are affiliated with Red Chamber [i.e., the U.S. owner in the joint venture], as well as to one customer in Canada. Because Red Chamber owned  51  percent of [Red Garden Food Processing Co., Ltd.], none of [Red Garden Food Processing Co., Ltd.]'s sales were made to an unaffiliated customer.

Shantou JCF sold shrimp to at least  seven  customers  in  the  United States, Canada, Chile, Mexico, and Malaysia. [Shantou Processing] could not recall the name(s) of some of its customers and stated that the documentation was lost in a computer crash. However, [Shantou Processing] also stated that it only maintained sales documentation for five years and, thus, there was no available documentation for this reason as well. Of  the  seven  customers  identified, four of the customers were not affiliated with Red Chamber.

[Shantou Processing] sold to  21  customers located  in  the  United States, Canada, Mexico, Saudi Arabia, Chile, the Philippines, South Korea,  and Taiwan. Of these customers, only one of the customers was affiliated with Red Chamber.

In short, the only overlap in customers among [Red Garden Food Processing Co., Ltd.], Shantou JCF, and [Shantou Processing] is that they all sold to companies affiliated  with  Red  Chamber.    With  the  exception  of  Ocean  Bistro Corporation,  a  common  customer  of  Shantou  JCF  and  [Shantou Processing], [Red Garden Food Processing Co., Ltd.], Shantou JCF, and [Shantou Processing] never sold to the same Red Chamber affiliated company.

Successorship Memo at 9-10.

customer base factor "weighs in favor of finding that [Shantou Processing]'s operations are materially dissimilar to [Red Garden Food Processing Co., Ltd.]'s." *Id.*

### E. Other Factors

Finally, Commerce considered several other factors, which, according to Commerce, further supported a negative successorship finding.

####     1.    Commerce Found That the Evidence Did Not Support Shantou Processing's Explanation for Its Name Changes in 2007 and 2013

It is important to keep in mind that for successor-in-interest analyses a company's name is not that important. The question is whether the successor's operations have remained the same as, or are not "materially dissimilar" from, the predecessor's operations. Successorship Memo at 5-6.

As stated in the Successorship Memo, Commerce did not find credible Plaintiff Shantou Processing's explanation for its name changes.[16] For Commerce, the record did not support

---

[16]     Commerce stated:

[Shantou Red Garden Food Processing Co., Ltd., i.e., Shantou Processing] claimed it changed its name to Shantou JCF in 2007 in response to harassment from its prior landlord's creditors because their names were similar. [Shantou Processing]'s prior landlord was a company named Shantou Longhu Hong Yuan Quick Frozen Factory (Quick Frozen). Hong Yuan, in Mandarin Chinese, means Red Garden. The name change to Shantou JCF became official on December 26, 2007. Additionally, [Shantou Processing] claimed:

> {s}ubsequently, a separate third party bought the master lease from the prior leaseholder. This removed any continuing exposure for [Shantou JCF], as the formerly similarly named entity no longer had any affiliation with the property. Accordingly, the name was changed back to [Shantou Red Garden Food Processing Co., Ltd. on] January 20, 2013.

In other words, [Shantou Processing]'s position is that it changed its name to avoid harassment from its landlord's creditors and changed its name back once the threat of harassment was gone (*i.e.*, once [Shantou Processing]'s former landlord had no affiliation with the property). The record, however, does not support this explanation.

Shantou Processing's claim that it changed names to avoid harassment by its former landlord's

creditors because (1) the landlord's debts were resolved and approved by a local court in China

before the company changed its name to Shantou JCF, and (2) Shantou Processing did not

substantiate with evidence its claim that, notwithstanding the resolution of the former landlord's

debts in 2007, harassment continued until 2013.

---

[Shantou Processing] provided a sales contract that transferred ownership of the property from Quick Frozen to Shen Rui Jie. The property that was transferred was for two buildings located at "No. 51 North Taishan Road." This is the same address in the business licenses for [Red Garden Food Processing Co., Ltd.], Shantou JCF, and [Shantou Processing]. This sales contract is dated October 23, 2007 and was confirmed by the Shantou Longhu Real Estate Exchange Administration Office on November 15, 2007. The Real Estate Certificate for this property shows that the "Source of Ownership" for Shen Rui Jie began in November 2007. Additionally, an agreement was reached between Quick Frozen and what appears to be its creditor. This agreement was recognized by the Shantou Intermediate People's Court of Guangdong Province on October 12, 2007. This ruling also dismissed the seizure of the property at the request of the creditor. Thus, based on record evidence, by the date that [Red Garden Food Processing, Co., Ltd.] changed its name to Shantou JCF (*i.e.*, December 26, 2007), the creditors had already reached an agreement, that agreement had been recognized by the Shantou Intermediate People's Court of Guangdong Province, and Quick Frozen had sold the property to Shen Rui Jie (a part owner of the current [Shantou Processing] and wife of the majority owner).

Given that the record indicates that Quick Frozen's debts were resolved in 2007, [the] claimed reasons for [Red Garden Food Processing Co., Ltd.'s] name change to Shantou JCF and then to [Shantou Processing] appear to be suspect. Additionally, [the] claim that [Shantou JCF] changed its name . . . after "a separate third party bought the master lease from the prior leaseholder," does not explain why it waited until 2013 to make this change, when the master lease was bought in 2007. When asked about this discrepancy, [Shantou Processing] responded that, even after the real estate transfer, the company was still bothered by debt collectors, and, therefore, it changed its name to address this issue. We note that [Shantou Processing] submitted no documentation to support this explanation, despite our request for such evidence.

Successorship Memo at 10-11.

### 2.   Commerce Found That the Name Changes Corresponded to Changes in Cash Deposit Rates

In the Successorship Memo, Commerce found:

> [Shantou Processing] also offered an additional explanation for its final name change:

>> Since the name [Shantou Red Garden Food Processing Co., Ltd.] had well known {*sic*} reputation in the seafood industry and also had separate {*sic*} anti-dumping rate case in USA . . . they changed the name from Shantou JCF back to [Shantou Red Garden Food Processing Co., Ltd., i.e., Shantou Processing].

> In other words, Shantou JCF changed its name to [Shantou Red Garden Food Processing Co., Ltd.] because [Red Garden Food Processing Co., Ltd.] had its own separate antidumping duty rate (albeit via an exclusion), whereas Shantou JCF is considered part of the China-wide entity.

> Rather than unilaterally attempting to claim the cash deposit rate of (or in this case, an exclusion for) a predecessor company, Shantou JCF should have requested a changed circumstance review . . . to prove that it was entitled to that rate. Further, we find it significant that the timeline of the name changes appears to correspond to changes in the cash deposit rates:

> - June 25, 2003: [Red Garden Food Processing Co., Ltd.] was established.
> - September 12, 2007: [Red Garden Food Processing Co., Ltd.] was assigned a cash deposit rate of 112.81 percent.
> - December 26, 2007: [Red Garden Food Processing Co., Ltd.] changed its name to Shantou JCF.
> - December 7, 2012: Commerce announced the preliminary results of its Section 129 determination and preliminarily calculated a cash deposit rate of 0.00 percent for [Red Garden Food Processing Co., Ltd.]. Commerce used the same identifying exclusion language in the Section 129 determination that it used in the *Order*, identifying the excluded merchandise as that produced and exported by "Red Garden Food Processing Co., Ltd.," and no party suggested to Commerce that there was any problem with that identifier.
> - January 20, 2013: Shantou JCF changed its name to [Shantou Red Garden Food Processing Co., Ltd.].
> - March 4, 2013: Commerce announced the final results of its Section 129 determination which found that, because the weight-average margin for [Red Garden Food Processing Co., Ltd.] was 0.00 percent and the determination related to the [less-than-fair-value] investigation, it should be revoked from the order (when it exported goods produced by itself or other specific producers).

- March 28, 2013: The revocation notice is published in the *Federal Register*.

     In summary, we find these additional factors when viewed together with the totality of the circumstances weigh in favor of finding that [Shantou Red Garden Food Processing Co., Ltd., i.e., Shantou Processing] is not the same company as [Red Garden Food Processing Co., Ltd.], and thus, it is not the successor-in-interest to that company.

Successorship Memo at 11-12.

### F.    Plaintiffs' Arguments Do Not Detract from the Substantiality of the Record Evidence Supporting Commerce's Successor-in-Interest Finding

Plaintiffs maintain that Shantou Processing was, in fact, excluded from the Order because it is the same company as Red Garden Food Processing Co., Ltd. Moreover, they claim that Shantou Processing "presented substantial evidence on the record to substantiate that it continues to operate in the [administrative review] substantially the same as it [i.e., Red Garden Food Processing Co., Ltd.] did in the [less-than-fair-value] investigation." Pls.' Br. at 30.

Plaintiffs thus urge the court to find that Commerce's successor-in-interest finding that Shantou Processing is not the same company as Red Garden Food Processing Co., Ltd. lacked the support of substantial evidence. In making this case, Plaintiffs challenge Commerce's findings with respect to the successor-in-interest test factors. The court considers each of Plaintiffs' arguments in turn and, for the following reasons, sustains Commerce's finding that Shantou Processing is not the successor-in-interest to Red Garden Food Processing Co., Ltd.

#### 1.  Plaintiffs' Arguments Questioning Commerce's "Management" Finding

Plaintiffs argue that, when considering the first factor of the totality of the circumstances test, i.e., changes in management, Commerce erroneously analyzed the ownership and control of Red Garden Food Processing Co., Ltd. and Shantou Processing, too. For Plaintiffs, Commerce "was supposed to limit its analysis only to 'management.'" Pls.' Br. at 31. Indeed, Plaintiffs argue, "Commerce did not discuss management at all," but "[r]ather . . . focused on how [Red Garden

Food Processing Co., Ltd.] had been a Sino-foreign joint venture in the investigation and was controlled by a board of directors, whereas in the [administrative review] it was owned by Chinese entities/individuals." *Id.* Additionally, Plaintiffs maintain that the record contained management evidence that Commerce failed to consider, "such as (1) the general manager was the same in [Red Garden Food Processing Co., Ltd. and Shantou Processing], (2) the general manager, in both time periods [i.e., at the time of the investigation and during the period of review], owned more than five percent of [the entities, i.e., Red Garden Food Processing Co., Ltd. during the period of investigation and Shantou Processing during the period of review], and (3) there was no need for a board of directors, since the general manager, his wife, and [Shantou Foodstuff] (which the general manager owned), had no need for a board." *Id.* Plaintiffs claim that "Commerce made no finding" regarding changes in the entities' management or operations across the two time periods, i.e., at the time of the investigation (Red Garden Food Processing Co., Ltd.) and during the period of review (Shantou Processing). *Id.*

The court finds Plaintiffs' arguments unpersuasive. Plaintiffs object to Commerce's consideration of changes in ownership and control apparently because the first factor of the successor-in-interest test is changes in "management." This claim both fails to recognize Commerce's authority for conducting the successor-in-interest analysis and demonstrates a misunderstanding of the test itself. Management means not only how the business is conducted day-to-day but also the overall direction of a business and its operations. *See generally* PETER F. DRUCKER, PETER F. DRUCKER ON MANAGEMENT ESSENTIALS 51 (Harvard Bus. Rev. Press 2020) ("top management," i.e. the board of directors, is the "unifying, determining, and deciding organ of enterprise and management"). Here, the record shows that issues of ownership and structure influenced and indeed affected the existence of a board of directors at all. Thus, it was not

unreasonable for Commerce to consider changes in ownership and structure together with management.

Also, contrary to Plaintiffs' argument, not only did Commerce consider the overlaps in management among Red Garden Food Processing Co., Ltd., Shantou JCF, and Shantou Processing, in particular the role of Zheng Chu Ci , but it took into account the record evidence that showed a change in the scope of that individual's decision-making authority,[17] which expanded with the dissolution of the board after 2013. *See* Successorship Memo at 7-8.

Plaintiffs' real argument is that they disagree with the way that Commerce weighed the evidence, but mere disagreement is not enough to demonstrate that Commerce's finding as to the management factor lacks the support of substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (describing substantial evidence as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence"). Thus, the court finds no error with Commerce's management finding. *See* Successorship Memo at 8 (finding that "there was significant change in ownership, control, and management between [Red Garden Food Processing Co., Ltd.] (as it existed at the time of the [less-than-fair-value] investigation) and [Shantou Processing] (now)," and that "[t]hese changes weigh in favor of finding that [Shantou Processing] (now) is materially dissimilar to [Red Garden Food Processing Co., Ltd.] (2003), and thus, is not the successor-in-interest to that company.").

---

[17]     The record shows that in 2003, when Red Garden Food Processing Co., Ltd. was established as a joint venture, its  constitution made its board of directors "the most powerful organization" that "decide (*sic*) on all the important business of the Company". Successorship Memo at 6. But later in 2013, when the change in name to Shantou Processing occurred, and the ownership and structure of the company changed as well, the independent board was dissolved, and the power became concentrated in  one  individual, Zheng Chu Ci.    Successorship Memo at 7-8 ("Zheng Chu Ci controls all decisions made by the company.").

### 2. Plaintiffs' Argument Questioning Commerce's "Production Facilities" Finding

Next, Plaintiffs take issue with Commerce's consideration of changes in "products," instead of only "production facilities." For Plaintiffs, "Commerce admitted that the production facilities and address remained the same," and "[t]hat should have ended the discussion." Pls.' Br. at 31. In Plaintiffs' view, "[s]ince . . . Commerce could not kill [Shantou Processing] on [the production facilities] count, it created a new count: products." *Id.* Plaintiffs claim that Commerce seeks to portray a difference in the companies' products by finding that Shantou JCF sold non-subject merchandise from 2007 to 2013, whereas Red Garden Food Processing Co., Ltd. and Shantou Processing only sold subject merchandise. Plaintiffs assert that during the original investigation "Commerce only asked [Red Garden Food Processing Co., Ltd. and Shantou Foodstuff] to report subject merchandise sold to the [United States]." *Id.* That is, "[t]he record does not show what [these companies] sold in the [period of investigation] . . . other than subject merchandise to the [United States]." *Id.* So, Plaintiffs claim, Commerce "not only has created a new category, but misrepresented what the Red Garden companies did in the [period of investigation]." *Id.* at 32.

The court finds unpersuasive the argument that Commerce's consideration of products was improper. By their claim that Commerce "misrepresented what the Red Garden companies did [i.e., what they sold] during the [period of investigation]," Plaintiffs suggest that Red Garden Food Processing Co., Ltd. and Shantou Foodstuff in fact sold non-subject merchandise to the United States or elsewhere during the original period of investigation, but those sales were not covered by Commerce's questionnaires. The problem is that Plaintiffs' claims of "misrepresentation" are unsupported. Plaintiffs do not contest the accuracy of, or record support for, Commerce's finding that Red Garden Food Processing Co., Ltd. sold subject merchandise, Shantou JCF sold non-

subject merchandise, and then Shantou Processing sold subject merchandise. Plaintiffs only imply, without evidence, that Commerce's finding is not the full story. The substantial evidence standard requires more than unsupported assertions of misrepresentation. *Consolo*, 383 U.S. at 620. The court thus finds no error with Commerce's finding regarding production facilities and products.

### 3. Plaintiffs' Argument Against Commerce's "Supplier Relationships" Finding

Regarding supplier relationships, Plaintiffs acknowledge that Shantou Processing "could not ascertain with certainty which of its current suppliers also supplied it in 2003, if any." Pls.' Br. at 32. Plaintiffs argue, however, that because of this uncertainty, it was mere speculation for Commerce "to determine that [Shantou Processing] has changed suppliers too significantly to be the same company it was in the [period of investigation]." *Id.*

Plaintiffs misstate Commerce's finding on supplier relationships and, again, fail to challenge the substantiality of the evidence supporting Commerce's supplier relationship finding in a serious way. In the Successorship Memo, Commerce acknowledged that the record was thin on supplier relationships prior to the period of review. But, based on statements by Shantou Processing that the company's "suppliers changed many times over the past 15 years," and the absence of any evidence of the suppliers' identities over the course of that fifteen-year period, Commerce found "no evidence on the record *with respect to this factor* which [sic] supports [Shantou Processing]'s claim that it continues to operate as [Red Garden Food Processing Co., Ltd.], the company revoked from the *Order*." Successorship Memo at 9 (emphasis added). This factor was one of several factors that Commerce considered in reaching its negative successorship determination, and Plaintiffs fail to demonstrate that Commerce's consideration of, and findings with respect to, this factor were unreasonable.

### 4.  Plaintiffs' Argument Contesting Commerce's Customer Base Finding

For the customer base factor, Plaintiffs argue that Commerce "tries to twist the facts to make it seems [sic] that [Shantou Processing] . . . was no longer operating in the same general way" as Red Garden Food Processing Co., Ltd. Pls.' Br. at 32. Specifically, they assert that Commerce found that Shantou Processing and Red Garden Food Processing Co., Ltd. shared "only one customer," but "the problem with this analysis" is that each of these companies "sold subject merchandise to only one company, an affiliate/subsidiary of Red Chamber Co." *Id.* As to the record evidence showing that Shantou JCF "sold shrimp around the world in 2007-2013," Plaintiffs maintain that drawing any distinction between the companies' operations on that basis is unreasonable because Commerce never asked about global sales for Red Garden Food Processing Co., Ltd. during the *original* investigation, only U.S. sales. *Id.* at 32-33.

Plaintiffs' argument appears to be that it was unreasonable for Commerce to consider Shantou JCF's global sales as evidence that its customer base was different because Commerce did not ask Red Garden Food Processing Co., Ltd. about its sales outside of the United States during the original period of investigation. This argument seems to miss the mark. Commerce found that the customer base factor did not support a finding of successorship because there was very little overlap in Red Garden Food Processing Co., Ltd.'s, Shantou JCF's, and Shantou Processing's customers. Indeed, Commerce found that "the only overlap in customers among [Red Garden Food Processing Co., Ltd.], Shantou JCF, and [Shantou Processing] is that they all sold to companies affiliated with Red Chamber," and that based on the record there were sales to customers outside of the United States that did not overlap. Successorship Memo at 9-10. Plaintiffs do not dispute that the record supports Commerce's findings, but only that had Commerce asked for other information, the record might support a different finding. *See, e.g.*, Pls.' Br. at 32-33

("The record of the [less-than-fair-value] investigation does not show to which countries [Shantou Foodstuff] and [Shantou Processing] sold. Why? Commerce never asked that question because it is not important to how these companies do business solely regarding subject merchandise sold to the U.S."). But Commerce must ground its findings in the record evidence that is before it and appears to have done so. Thus, Plaintiffs have failed to show that Commerce's customer base finding is unreasonable or unsupported by the record.

### 5. Plaintiffs' Argument Questioning Commerce's Findings Regarding "Other Factors"

Finally, Plaintiffs dispute Commerce's findings regarding the "other factors" that Commerce considered as a part of its "totality of the circumstances" test. Plaintiffs assert that they provided Commerce with information that showed that the business license number, address, general manager, and manner of doing business were the same for Red Garden Food Processing Co., Ltd., Shantou JCF, and Shantou Processing, and that it explained its rationale for changing names in 2007 and 2013. Pls.' Br. at 33. With respect to the six-year delay between 2007 and 2013 to change names from Shantou JCF to Shantou Processing after the master lease changed ownership, Plaintiffs assert that the harassment did not end in 2007, so Shantou JCF delayed making the change. Plaintiffs deny that the name change in 2013 had anything to do with the Section 129 proceeding. *Id.* at 34.

Plaintiffs again do not argue that the evidence Commerce relied upon is flawed, but rather ask the court to accept their interpretation of the evidence instead of Commerce's. Plaintiffs do not, however, identify a reason for the court to conclude that Commerce's interpretation of the evidence was unreasonable.

So, while individual pieces of evidence (e.g., that the business license number, production facilities address, and the person holding the title of general manager were the same for Red

Garden Food Processing Co., Ltd., Shantou JCF, and Shantou Processing) might tend to suggest continuity among the companies, it does not necessarily follow that it was unreasonable for Commerce to conclude that Shantou Processing operated in a materially dissimilar way from its alleged predecessor, Red Garden Food Processing Co., Ltd., after taking into account the entire record. For example, regarding management, though the same individual held the title of general manager in the different incarnations of the entity, *the record evidence shows that the scope of that individual's authority changed*. The role of the general manager in Red Garden Food Processing Co., Ltd. (which at the time of its formation was a Sino-U.S. joint venture) was to carry out the decisions made by an independent board appointed by the company's owners.[18] After the reported changes in name, ownership, and structure in 2007 and 2013, the independent board was dissolved, and the power became concentrated in the general manager.[19] *See* Successorship Memo at 7.

The facts that Commerce relied upon to conclude that the record did not support Shantou Processing's claim that it changed names to avoid harassment by its former landlord's creditors, i.e., (1) that the landlord's debts were resolved and approved by a local court in China before the company changed its name to Shantou JCF, and (2) that Shantou Processing did not substantiate with evidence its claim that, notwithstanding the resolution of the former landlord's debts in 2007, harassment continued until 2013, are not seriously disputed, only the meaning and weight Plaintiffs would have Commerce attribute to them. But critically, Plaintiffs have failed to demonstrate why Commerce's interpretation of the facts is *unreasonable*. "[T]he possibility of drawing two

---

[18]        Successorship Memo at 6 ("[Red Garden Food Processing Co., Ltd.]'s constitution states that "the board {of directors} is the most powerful organization . . . and decide (*sic*) on all the important business of the Company.").

[19]        Successorship Memo at 7-8 ("Zheng Chu Ci controls all decisions made by the company.").

inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo*, 383 U.S. at 620 (describing substantial evidence as "something less than the weight of the evidence"). Thus, the court finds no error with Commerce's "other factors" findings.

### G.  Plaintiffs' Remaining Arguments Lack Merit

Plaintiffs challenge the Final Results based on other arguments, too, each of which is flawed in its own way.

#### 1.  The Underlying Review Was Not Void Ab Initio

Plaintiffs argue that the underlying administrative review was void ab initio because Commerce had no authority to review Shantou Processing.

According to Plaintiffs' brief, in 2020, Shantou Processing placed a letter to Commerce on the record of the separate Section 129 proceeding, discussed *supra* note 4. The letter argued that Commerce erred when it excluded Red Garden Food Processing Co., Ltd. from the Order instead of *Shantou* Red Garden Food Processing Co., Ltd. *See* Pls.' Br. at 21 (emphasis added). Because the letter was placed on the Section 129 record, it is not on the record in this case. *Id.* (emphasis added) ("The letter was correctly filed under the Section 129 Proceeding, rather than in the [underlying administrative review] proceeding and, therefore, *is not on this administrative record*. On May 22, 2020, Commerce rejected that request."). In that separate Section 129 proceeding, Shantou Processing asked Commerce to correct the alleged naming error in the Revocation Notice. The request was made seven years after the Revocation Notice was published in 2013. Commerce rejected Plaintiffs' request as untimely. The rejection of the request is not on the record before the court. *Id.*

Plaintiffs now ask the court to direct Commerce to add to the record here all of the documents from the record of the Section 129 proceeding, so the court can review Commerce's rejection of Plaintiffs' request to correct the naming error. For Plaintiffs, if the Department fixed that error, it would necessarily conclude that Shantou Processing was not subject to the administrative review because its merchandise was excluded from the Order. *Id.* at 10-15.

Plaintiffs' void ab initio argument fails for several reasons. First, Plaintiffs bore the "burden of creating an adequate record" during the administrative review before Commerce. *See BMW of N. Am. LLC v. United States*, 926 F.3d 1291, 1295 (Fed. Cir. 2019) (citation omitted). The time for building the administrative record has passed. Plaintiffs do not argue that Commerce improperly rejected information that they attempted to place on the record of the underlying administrative review in this case, or that Commerce improperly relied on Section 129 documents that were not a part of the record.[20] Indeed, early in this review, when Commerce asked Plaintiffs to clarify the relationship between Red Garden Food Processing Co., Ltd. and Shantou Processing, Plaintiffs did not seek to place documents from the Section 129 proceeding on the record here.[21]

---

[20]    The court notes, however, that Commerce has been known to rely on documents that it placed "on the record late in the proceeding, alerting the parties to it only in its Final IDM." *See Jilin*, 45 CIT at __, 519 F. Supp. 3d at 1233 (where Commerce placed on the record documents from the investigation involving aluminum foil from China late in the proceeding without giving the parties an opportunity to comment).

[21]    It appears that, as parties to the Section 129 proceeding, Plaintiffs had access to record documents and had notice of the alleged ministerial error. As noted by Commerce:

Pursuant to 19 CFR 351.224(c)(2), comments concerning ministerial errors must be filed within five days after Commerce has released disclosure documents or held a disclosure meeting. *Commerce released the signed, unpublished Federal Register notice to which the alleged ministerial error pertains to parties on March 25, 2013, and this notice* [i.e., the Revocation Notice] *published on March 28, 2013; thus, the deadline for any ministerial error allegation in that inquiry was April 1, 2013. Parties to the proceeding were on notice at that time and were aware of how*

Thus, the court denies Plaintiffs' request "to allow all documents from the Section 129 proceeding to be entered into the record herein." Pls.' Br. at 21. It is simply too late.

Second, the underlying review of Shantou Processing is not "void" because it was commenced in accordance with the applicable statute and regulations. Each year, by statute, interested parties may request an administrative review of an antidumping or countervailing duty order on the anniversary date of the publication of the order. *See* 19 U.S.C. § 1675(a)(1). In an administrative review of an antidumping duty order, Commerce must "review, and determine . . . the amount of any antidumping duty" and publish notice of "any duty to be assessed [and] estimated duty to be deposited[.]" *Id.*

Here, Commerce received timely requests for review of Shantou Processing and Shantou Foodstuff from the domestic producers. *See* Final IDM at 7-8 (stating that Commerce "received timely requests for review, in accordance with 19 CFR 351.213(b)"); *see also* 19 C.F.R. § 351.213(b)(1) (providing that "[e]ach year during the anniversary month of the publication of an antidumping or countervailing duty order, a domestic interested party or an interested party . . . may request in writing that the Secretary conduct an administrative review under [19 U.S.C. § 1675(a)(1)]"). Commerce, accordingly, initiated the underlying review of the Order for the companies that allegedly dumped subject shrimp during the period of review. Final IDM at 8 (noting review covered "102 companies, including [Shantou Processing] and [Shantou Foodstuff] (but only where the exports of this latter company were of merchandise not produced by particular companies [i.e., those excluded from the Order in accordance with the Revocation Notice])."). As

---

*Commerce had implemented its determination by March 25, 2013.* In short, interested parties [could] have discovered and alleged a ministerial error in the section 129 inquiry during the time period specified by our regulations.

Final IDM at 8-9 (emphasis added).

the court finds no error with respect to the initiation of the underlying review, Plaintiffs' void ab initio argument lacks merit.

Next, Plaintiffs argue that the initiation of the review as to Shantou Processing was void because Shantou Foodstuff and Shantou Processing were collapsed into a single entity during the original less-than-fair-value investigation, and therefore Commerce "implicitly excluded" Shantou Processing's merchandise from the Order when it excluded Shantou Foodstuff's exports in the Section 129 proceeding. *See* Pls.' Br. at 13 ("[E]ven if Commerce does not admit that [Shantou Processing] was specifically excluded from the Order, it was implicitly excluded since, in the [less-than-fair-value] investigation, Commerce determined [Shantou Processing] and [Shantou Foodstuff] were so closely joined that they should be treated as a single entity, i.e., collapsed.").

The gist of Plaintiffs' argument seems to be that Commerce's collapsing decision in the original investigation meant that Shantou Foodstuff and Shantou Processing would be treated as one collapsed entity across different proceedings no matter what the companies' actual future relationships might be. Plaintiffs do not cite any legal authority to support this proposition. Moreover, this claim is refuted by the very documents that Plaintiffs quote in their brief, including the final decision memorandum from the original investigation. There, Commerce stated that the determination "to apply the [Shantou Foodstuff] rate to both [Shantou Foodstuff] and [Red Garden Food Processing Co., Ltd] . . . is *specific to the facts presented in the investigation* and based on several considerations, including the *structure* of the collapsed entity, *the level of control* between [Shantou Foodstuff] and [Red Garden Food Processing Co., Ltd.] and the *level of participation* by *each party* in the proceeding." Investigation IDM at 30 (emphasis added). In making their "implicitly excluded" argument, Plaintiffs appear to have ignored this limiting language.

Plaintiffs also fail to note that nowhere in the Revocation Notice did Commerce mention collapsing with respect to Shantou Foodstuff.[22] Instead, Commerce expressly treated Red Garden Food Processing Co., Ltd. and Shantou Foodstuff as separate entities when identifying the exporter-producer combination whose merchandise was excluded from the Order, and specifically excluded, e.g., merchandise "manufactured by Red Garden Food Processing Co., Ltd. . . . and exported by [Shantou Foodstuff] or[23] Red Garden Food Processing Co., Ltd." Revocation Notice, 78 Fed. Reg. at 18,959 n.14. In other words, had Commerce intended to treat the entities as collapsed it would have done so, but in fact it treated them as distinct entities.

Most importantly, Commerce has found, and the court has agreed, that Shantou Processing was not the successor-in-interest to Red Garden Food Processing Co., Ltd. and so could not have been excluded from the Order implicitly or otherwise.

### 2. Commerce's Use of the Successor-in-Interest Test in the Context of an Administrative Review Was Lawful

Next, Plaintiffs argue that Commerce unlawfully commenced a changed circumstances review, or something like one, because Commerce's regulations require that there be a request for a changed circumstances review before one may be initiated, and no party made such a request. Pls.' Br. at 27 ("A [change circumstances review] (or anything purport [sic] to utilize the [changed

---

[22]      The court notes that in those cases where Commerce intended to treat respondents as a single collapsed entity for purposes of revocation, it said so in the Revocation Notice. *See, e.g.*, Revocation Notice, 78 Fed. Reg. at 18,959 n.10 (noting that diamond sawblades respondent Advanced Technology & Materials Co., Ltd., "[c]ollectively with Beijing Gang Yan Diamond Product Company . . . and Yichang HXF Circular Saw Industrial Co., Ltd . . . , [was] a single entity"). The absence of any mention in the Revocation Notice that Shantou Foodstuff and any other company should be treated as a collapsed, single entity for purposes of revocation, is consistent with Commerce's statement that the decision to collapse in the 2004 final determination was "specific to the facts presented in the investigation." Investigation IDM at 30.

[23]      Commerce's use of the word "or" here also indicates that the companies were not treated as collapsed.

circumstances review] regulation) can be started by one mechanism: an interested party requesting it."). Not only is this argument faulty on the law,[24] but as discussed in the Background, the record shows that Commerce conducted a successor-in-interest analysis in the context of an administrative review (not a changed circumstances review) at the request of the American Shrimp Processors Association.

Moreover, as to Plaintiffs' objection to Commerce's citation of *East Sea Seafoods LLC v. United States* in the Final IDM, the court finds no error. In the Final IDM, Commerce cited this case as an *example* of where this Court "upheld Commerce's decision to find that the respondent

---

[24]        A request from an interested party is not required under the statute or the regulations to commence a changed circumstances review. Subsection 1675(b)(1) provides in pertinent part:

> *Whenever* [Commerce] . . . receives information concerning, *or* a request from an interested party for a review of . . . a final affirmative determination that resulted in an antidumping duty order . . . which shows changed circumstances sufficient to warrant a review of such determination . . . , [Commerce] . . . shall conduct a review of the determination . . . after publishing notice of the review in the Federal Register.

19 U.S.C. § 1675(b)(1) (emphasis added). In other words, Commerce is authorized to initiate a changed circumstances review at any time ("whenever") Commerce either "receives information" *or* receives a request for review from an interested party about a final dumping determination, and, critically, the information or request "shows changed circumstances sufficient to warrant a review of such determination." By the statute's plain terms, then, a request by an interested party is not a prerequisite for review.

Commerce's regulations conform to the statute's direction that Commerce initiate a changed circumstances review "whenever" it receives information, or a request, sufficient to warrant such review. For example, an interested party "may request" a changed circumstances review "[a]t any time." 19 C.F.R. § 351.216(b). The Department also may self-initiate a review: "If the Secretary decides that changed circumstances sufficient to warrant a review exist, the Secretary will conduct a changed circumstances review in accordance with § 351.221." *Id.* § 351.216(d). Subsection 351.221, in turn, provides for the commencement of a review "[a]fter receipt of a timely request for a review, *or on the Secretary's own initiative when appropriate.*" *Id.* § 351.221(b) (emphasis added). Thus, Plaintiffs' argument that a request by an interested party is required before Commerce may consider changed circumstances finds no support in either the statute or the regulations.

was not the [successor-in-interest] to a predecessor company within the context of an [administrative review]." Final IDM at 19. Plaintiffs object to the use of this case because, they argue, it is not on point. *See* Pls.' Br. at 26-27 ("The problem . . . is that *East Sea Seafoods* did not address the issue [of] whether Commerce had the authority to conduct an [successor-in-interest] inquiry."). *East Sea Seafoods* involved the fifth administrative review of an antidumping duty order on merchandise from Vietnam. After the preliminary results were published, Commerce issued a supplemental questionnaire to a voluntary respondent that argued, in its case brief, that it should have received a rate that was determined for its claimed predecessor. The supplemental questionnaire asked for information on changes to the voluntary respondent's name, ownership, management, and suppliers that were reported to have occurred during the period of review. *East Sea Seafoods LLC v. United States*, 34 CIT 438, 449, 703 F. Supp. 2d 1336, 1347 (2010).

Among the issues in that case was whether Commerce had erred by comparing the claimed successor company "with the last version of the alleged predecessor that had been subject to agency review." *Id.*, 34 CIT at 456, 703 F. Supp. 2d at 1352. Stating that "Commerce needs to have a reasonable method for conducting the analysis that will lead to a fair result in light of the totality of circumstances," the *East Sea Seafood* Court went on to find that Commerce's comparison method was "patently reasonable." *Id.* (cleaned up). Thus, the Court upheld Commerce's negative successorship determination as lawful and supported by the record in that case.

The court thus finds no error with Commerce's citation of *East Sea Seafoods* as a case where this Court upheld Commerce's application of the successor-in-interest test in the context of an administrative review of an antidumping duty order.

Ultimately, Plaintiffs' arguments against conducting a successor-in-interest analysis in an administrative review cannot be credited. The Department was not required to take Plaintiffs' word for it that Shantou Processing and Red Garden Food Processing Co., Ltd. were sufficiently the same company such that Shantou Processing could take advantage of the exclusion in the Revocation Notice. Rather, once Plaintiffs made the "same company" claim, Commerce was entitled to find out. Thus, just as in *East Sea Seafoods*, here, "Commerce needs to have a reasonable method for conducting the analysis that will lead to a fair result in light of the totality of circumstances." *Id.* (cleaned up). Plaintiffs do not argue that Commerce's successor-in-interest test itself is unreasonable. Rather, they question "whether Commerce had the authority to conduct a 'successor-in-interest' . . . investigation, under the authority of its changed-circumstances regulation, without meeting the requirements of that regulatory provision." Pls.' Br. at 2. Nothing that Plaintiffs have presented to the court demonstrates that Commerce's initiation of a successorship analysis was unlawful or unreasonable.

## II.   The Court Finds No Error with Commerce's Deactivation of the Excluded Combination

The court next turns to Plaintiffs' claim that in the Final Results Commerce improperly deactivated the exporter-producer combination that was excluded from the Order by the Revocation Notice. [25]

---

[25]   Plaintiffs' claim here rests on the argument that Commerce acted unlawfully *in the Section 129 proceeding* by imposing the combination rate in 2013: "Commerce in the Section 129 revocation ha[d] no authority to impose [a combination rate] for the first time – eight years after imposition of the Order. And, hence, Commerce has no authority to deactivate them" in the underlying review. Pls.' Br. at 36. As noted, the record and decisions made in the Section 129 proceeding are not before the court in this case. As will be seen, the court finds no error with Commerce's deactivation of the rate based on the record here.

The excluded combination involved Red Garden Food Processing Co., Ltd., as producer and exporter, five other Chinese producers, and Shantou Foodstuff, an exporter. Specifically, the Revocation Notice stated that Commerce was revoking the Order with respect to

> merchandise *manufactured by Red Garden Food Processing Co., Ltd.*, or Chaoyang Jindu Hengchang Aquatic Products Enterprise Co., Ltd., or Raoping County Longfa Seafoods Co., Ltd., or Meizhou Aquatic Products Quick-Frozen Industry Co., Ltd., or Shantou Jinyuan District Mingfeng Quick-Frozen Factory, or Shantou Long Feng Foodstuffs Co., Ltd., and *exported by* [*Shantou Foodstuff*] *or Red Garden Food Processing Co., Ltd.*

Revocation Notice, 78 Fed. Reg. at 18,959 n.14 (emphasis added).

In the Final Results, based on information that Plaintiffs placed on the record, Commerce found that

> all of the other producers [i.e., other than Red Garden Food Processing Co., Ltd.] listed in the excluded combination are no longer in business. Further, we have determined that [Shantou Processing] is not the same entity as [Red Garden Food Processing Co., Ltd.]. Based on this information, we find that the producer/exporter combination excluded from the *Order* no longer exists. As a result, Commerce finds it necessary and appropriate to inform [Customs] that the exclusion for this exporter-producer combination is no longer active.

*Id.* at 28. In other words, Commerce found that it was "appropriate to deactivate" this exporter-producer combination because "no companies in the excluded exporter-producer chain are still active." Final IDM at 26, 27.

The court finds no error with Commerce's deactivation of the rate for the excluded exporter-producer combination. As Commerce lawfully found, Shantou Processing is not a successor to Red Garden Food Processing Co., Ltd. Moreover, Plaintiffs concede that none of the other producers named in the Revocation Notice are still in business. Thus, because none of the producers in the excluded exporter-producer combination are still in existence, Commerce's decision to deactivate the combination rate is supported by the record.

Plaintiffs do not seriously dispute the facts underlying Commerce's deactivation decision. Plaintiffs' argument that the now-defunct producers might somehow reinstitute operations in the future, and so for that reason, the combination rate should remain active in the meantime, seems something of a stretch. Pls.' Br. at 36 ("While [Shantou Processing] could not find any activity by these supplier companies [i.e., the five Chinese producers] . . . this does not preclude these companies, if indeed inactive, from renewing business operations and operating in conjunction with [Shantou Processing and Shantou Foodstuff] in the future.").

Thus, the court finds no error with Commerce's decision to deactivate the combination rates in the Final Results.

### III.    Commerce's Adjustment to U.S. Price Is Sustained

Plaintiffs object to an adjustment that Commerce made to U.S. price when calculating the antidumping duty rate for Shantou Processing.

Commerce's regulations state that Commerce shall calculate U.S. price net of any price adjustments that are "reasonably attributable" to the subject merchandise. *See* 19 C.F.R. § 351.401(c). The term "price adjustments" is defined as "a change in the price charged for subject merchandise or the foreign like product, such as a discount, rebate, or other adjustment, including, under certain circumstances, a change that is made after the time of sale . . . that is reflected in the purchaser's net outlay."" *Id.* § 102(b)(38).

Here, for some U.S. sales, Commerce adjusted U.S. price by subtracting from the invoice price (called the gross unit price[26]) amounts paid to Shantou Processing's ocean carrier but

---

[26]    Though not defined in the record, the court understands "gross unit price" to mean the invoice price that is "not adjusted or reduced by deductions or subtractions." *See* SIDNEY

refunded to Shantou Processing. The refunded amounts were for inland U.S. trucking services needed to transport the shrimp from the port to customer warehouses (cold storage) that the carrier did not, in fact, provide. Rather, the U.S. customer paid a different company for that service. Commerce subtracted these amounts from gross unit price "because the record indicated that [these amounts] related to a *reduction* to gross unit price for 'truck fees.'" Final IDM at 29 (emphasis added).

Commerce stated, by way of explanation, why it treated the amount as a deduction to the gross unit price:

> In this case, [Shantou Processing] deducted the truck fees in question from the total invoice price, and *the customer [i.e., the U.S. purchaser] paid [Shantou Processing] this net amount*.
>
> [Shantou Processing] reported that all of its sales of subject merchandise to the United States during the [period of review] were made on a CNF [or "cost and freight"] basis and shipped to a cold storage facility located in the United States. As [Shantou Processing] explained, under these delivery terms, *it was responsible for delivering the products to the cold storage facility*. Therefore, based on the shipping term of CNF, and [Shantou Processing's] own explanation, the expense for trucking the goods from the U.S. port to this facility was part of the invoice price. [Shantou Processing] reported that its international freight provider typically provides door-to-door service at an all-inclusive ocean freight price (*i.e.*, from [Shantou Processing's] factory to the cold storage facility in the United States). However, [Shantou Processing] also stated that, during the [period of review], *its freight provider was unable to provide freight services* from the U.S. port to the cold storage facility on certain shipments, and, instead, [Shantou Processing's] *U.S. customer arranged and paid for that freight*. In compensation, [Shantou Processing] deducted the cost of the trucking expenses paid by its U.S. customer from the invoiced price (which included U.S. inland freight expense that [Shantou Processing] did not provide). Thus, based on the record information, this adjustment is properly considered as a deduction to the gross unit price, and we have treated it as such.

---

DAVIDSON, CLYDE P. STICKNEY & ROMAN L. WEIL, FINANCIAL ACCOUNTING 823 (4th ed. 1985) (defining "gross"); *see also* Final IDM at 29 n.158 (emphasis added) (stating that Shantou Processing "reported the per-unit prices on the invoice in the gross unit price field in the U.S. sales database; therefore, *in order to arrive at the net outlay to the purchaser, it is necessary to deduct the reported per-unit truck fees from those gross unit prices*.").

Final IDM at 29-30 (emphasis added). In other words, for some U.S. sales, where trucking services were not provided, Shantou Processing deducted the cost of the trucking expenses to the cold storage facility from the invoiced price. Commerce treated this as a "deduction to the gross unit price," and adjusted the U.S. price accordingly.

Plaintiffs argue that, because the ocean carrier gave Shantou Processing a refund for services it failed to provide on certain U.S. sales, Commerce should have treated the refund as "income" and an addition to the gross unit price. In Plaintiffs' words:

> [T]he ocean carrier would give [Shantou Processing] a "through rate" from its warehouse to the customer's warehouse in the [United States]. [Shantou Processing] paid for that full service . . . . For certain U.S. sales, however, the ocean carrier was unable to deliver to the U.S. customer's warehouse. Rather, it could only deliver to the U.S. port. Because of that, it gave a refund to [Shantou Processing] for that lack of service between the U.S. port and customer's warehouse. *This constitutes income/revenue to [Shantou Processing] which Commerce should have added to the gross unit price.* Instead, Commerce deducted it from the gross unit price. This artificially increased the dumping margin, thereby not resulting in calculation of a dumping margin as accurately as possible.

Pls.' Br. at 37 (emphasis added).

For Plaintiffs, "[a] reduction in an expense equates to increase in net income." *Id.* ("[Shantou Processing] got a refund from the shipping company for these services it failed to provide, i.e., truck transport from the U.S. port to the U.S. warehouse. This is income to [Shantou Processing]. A reduction in an expense equates to increase in net income."). Plaintiffs further argue that by subtracting the "truck fee" amount from gross unit price "Commerce is actually double-counting it, since it was already accounted for in the ocean freight expenses." *Id.* at 38.

Both of these arguments seem to be failures of arithmetic. Shantou Processing was paid by its U.S. customer only for the product and services it received. That is, Shantou Processing's income was an amount for the shrimp and an amount for shipping the shrimp from China to the United States. This latter amount did not contain anything for shipping the shrimp to the U.S.

customer's cold storage facility. These two amounts (1) for the shrimp, and (2) for shipping were booked as income. To be clear, since inland freight was not provided, the customer did not pay Shantou Processing for shipping the shrimp to the cold storage facility. The customer paid the trucker for inland freight, and Shantou Processing's invoice price (the "gross unit price") did not contain any amount for inland freight. Shantou Processing had paid its shipper for inland freight (a service that was not provided) and received a refund for contracted services paid for, but not rendered. The result was a wash, as if Shantou Processing had never paid for the services in the first place.

Even if Plaintiffs reported refunds as "revenue" that does not make it so. Rather, the record shows that Shantou Processing removed trucking expenses from the impacted U.S. sales:

> [R]eviewing [Shantou Processing's] invoice contained in its section A response, one can see that in its commercial invoice there are three lines for shrimp products and a separate line for "DEDUCT TRUCK FEE." In other words, [Shantou Processing] was not receiving a freight revenue, but was reducing the invoice value, and thereby reducing gross unit price. Thus, for these final results, we continue to treat this as a price adjustment and deduct . . . this field from gross unit price.

Final IDM at 30. Thus, the proper way to look at this is as two transactions: (1) Shantou Processing paid for trucking services that were not performed and received a refund; and (2) Shantou Processing's U.S. customer then paid for trucking to the cold storage facility, and the invoice amount did not contain the amount for trucking services paid by the customer. Because Commerce's U.S. price adjustment is supported by substantial evidence and otherwise in accordance with law, it is sustained.

## CONCLUSION

Based on the foregoing, the court denies Plaintiffs' motion and sustains the Final Results.

Judgment will be entered accordingly.

_____/s/ Richard K. Eaton_____
Judge

Dated: May 12, 2023
        New York, New York